IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

LILBURN J. NUNNELEE II,
     Plaintiff,

vs.                          Case No. 3:11cv481/MCR/CJK

DAVID MORGAN, et al.,
     Defendants.

_____

## REPORT AND RECOMMENDATION

Plaintiff, proceeding *pro se* and *in forma pauperis*, has filed a third amended civil rights complaint pursuant to 42 U.S.C. § 1983. (Doc. 19). Upon review of the amended complaint[1], the undersigned concludes that plaintiff has not presented an actionable claim, and that the complaint should be dismissed.

## BACKGROUND AND PROCEDURAL HISTORY

Plaintiff's complaint names three defendants: Sheriff David Morgan, Deputy Sheriff Sandra Webber, and unknown John Doe(s) employed by the Escambia County Sheriff's Department. (Doc. 19, p. 2). Plaintiff alleges that on October 7, 2007, he accidentally ran over and killed a "hyper-aggressive roaming Jack Russell Terrier" on Eight Mile Creek Road in Escambia County, Florida. (Doc. 19, p. 4). Plaintiff, immediately after running over and killing the dog, "assumed a defensive posture as to the only other witness to the incident," because plaintiff, years earlier, had "experienced difficulties with the dog owner keeping a vicious German Shepard in

_____

[1] Plaintiff has amended his complaint twice upon his own motion. (Docs. 5,2). Plaintiff filed the present third amended complaint pursuant to an amend order, intended to provide a guide for plaintiff to correct deficiencies in the prior pleadings. (Doc. 18).

check while plaintiff walked the public road for exercise." (Doc. 19, p. 4). Plaintiff's mother, additionally, had "accidentally run over one of the owner's roaming dogs some two decades ago . . . ." (Doc. 19, p. 4). Plaintiff claims that he attempted to contact the dog's owners, but they were not at home. (Doc. 19, p. 4). Plaintiff spoke to a neighbor who reassured him that the dog's owners would be contacted, and plaintiff departed the scene. (Doc. 19, p. 4).

Shortly thereafter, a "neighborhood intermeddler with highly placed associates within the Escambia County Sheriff's Office (due to her deceased husband's high ranking within the department) . . . accused the plaintiff of an intentional crime and demanded action." (Doc. 19, p. 4). Plaintiff and the "intermeddler" have a "long standing feud, as the plaintiff once called her out regarding an attempted murder plaintiff believed to have been committed by her son upon an innocent motorist driving upon a neighboring highway; the sheriff's department quashed the investigation." (Doc. 19, p. 4). Plaintiff alleges that the dog's owner never reported the incident that took the dog's life. (Doc. 19, p. 4).

Some time after the incident, Deputy Webber "was summoned to the neighborhood" and told the "complainants" the case was a "civil matter." (Doc. 19, p. 4). After a question posed by Deputy Webber–"Mr. Nunnelee, were you involved in running over a dog?!"–plaintiff inferred that this deputy must have been unaware that roaming dogs "get run over several times a day in Escambia County." (Doc. 8, p. 4). Deputy Webber's tone, speech, and characterization of the incident caused plaintiff concern about the deputy's "neutral mindset." Plaintiff then asserted his right to a lawyer by exclaiming, "you (apparently a reference to Deputy Webber) are not here to eat hot dogs with me! I want a lawyer!" (Doc. 19, pp. 4-5). At the time, plaintiff found himself "undergoing the initial stages of a brief reactive psychosis,

resulting from the dog's injury." (Doc. 19, p. 5). Plaintiff continued to assert his "right to a lawyer" until Webber "rocketed down plaintiff's rural driveway in a clearly unprofessional and immature manner." (Doc. 19, p. 5).

"Reportedly" Deputy Webber then told the "complainants" she was going to check with her supervisor to see what charges could be filed against plaintiff. (Doc. 19, p. 5). Later that evening or the following morning, the Escambia County Sheriff's Department issued a news release that the department "intended to file information seeking the felony arrest of the plaintiff." (Doc. 19, p. 5). Plaintiff was not aware of the news release. (Doc. 19, p. 6). Plaintiff claims Deputy Webber later submitted an arrest affidavit, in which Deputy Webber "recklessly and willfully omitt[ed] readily available exculpatory evidence . . . ." (Doc. 19, p. 6). Plaintiff further alleges Deputy Webber did not attempt to discover independent facts from the dog owner or witnesses "as to the voracity or aggressive propensity of the dog's car-chasing or blocking behavior while the dog roamed on the road, stating at the deposition on February 15, 2008, '. . . that is not my job.'" (Doc. 19, p. 6). Plaintiff also claims Deputy Webber failed to investigate whether plaintiff had the purposeful intent to harm the dog, whether witnesses' conclusory statements "were subject to further vetting in order to determine" if there was actual intent, and interview the complainant regarding how she was able to "allege an intentional crime when she was not a witness to any event or statements surrounding the matter." (Doc. 19, p. 6).

When plaintiff came home on the day after the demise of the dog, he found "a street filled with television reporters and cameramen." Accordingly, plaintiff "felt compelled" to consent to interviews because of "coerced voluntariness." (Doc. 19, p. 7). At that point, a cameraman from Channel 3 news ("WEAR") of Pensacola "employed a technique that prodded a fearful and defensive plaintiff into forcefully

making a statement that cast plaintiff in a false light." (Doc. 19, p. 7). Deputy Webber submitted "aired portion" of this recorded conversation "into evidence." (Doc. 19, p. 7). Defendant continues on to claim that Deputy Webber's sergeant stated to plaintiff, "perhaps nothing would have come of it, had you cooperated." (Doc. 19, p. 7). Plaintiff argues Deputy Webber made no effort to secure the entire WEAR interview which would have provided context to plaintiff's incriminating statements. (Doc. 19, p. 7). Plaintiff indicates that the full tape would show he did not intentionally run over the dog; instead, the dog's "hypertensive menacing of automobiles" forced the plaintiff to come to a complete stop every time he encountered the dog. "[Plaintiff] eventually trained and desensitized the dog to the notion that plaintiff would seek to gradually increase his speed so that he could drive the lawful speed limit and that such training took several days to accomplish, and . . . appeared to have worked well . . . until the day of the accident, where . . . the dog harmed himself by turning in front of plaintiff's automobile at the last second prior to impact, in an apparent attempt to race the automobile." (Doc. 19, p. 8). Plaintiff thus alleges that the dog engaged in volitional acts that ultimately led to its own demise.

On October 11, 2007, plaintiff was charged with felony animal cruelty. (Doc. 19, p. 8). Plaintiff notes that on May 13, 2008, the charges were nolle prossed. (Doc. 19, p. 8). Based on the foregoing allegations, plaintiff asserts the following claims: (1) retaliatory arrest, (2) malicious prosecution, and (3) conspiracy. (Doc. 19, p. 9). Plaintiff seeks compensatory and punitive damages of $1,000,000.00. (Doc. 19, p. 9).

## DISCUSSION

Because plaintiff is proceeding *in forma pauperis*, the court may dismiss the

case if satisfied that the action is "(i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). The court must read plaintiff's *pro se* allegations in a liberal fashion. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). Dismissals for failure to state a claim are governed by the same standard as FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6). *See Mitchell v. Farcass*, 112 F.3d 1483, 1485 (11th Cir. 1997). In determining whether the complaint states a claim upon which relief may be granted, the court accepts all factual allegations in the complaint as true and evaluates all reasonable inferences derived from those facts in the light most favorable to the plaintiff. *See Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1483 (11th Cir. 1994). The complaint may be dismissed if the facts as pleaded do not state a claim to relief that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (retiring the negatively-glossed "no set of facts" language previously used to describe the motion to dismiss standard and dismissing plaintiffs' case for failure to state a claim, because plaintiffs had "not nudged their claims across the line from conceivable to plausible"). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009).

Under FEDERAL RULE OF CIVIL PROCEDURE 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Supreme Court reiterated in *Iqbal*, 129 S. Ct. at 1949, although RULE 8 does not require detailed factual allegations, the rule does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." The mere possibility that the defendant acted unlawfully is insufficient to survive dismissal for failure to

state a claim. *See id.* Rather, the complaint must include "[f]actual allegations . . . [sufficient] to raise a right to relief above the speculative level," that is, "across the line from conceivable to plausible . . . ." *See Twombly*, 550 U.S. at 555, 570.

A complaint is also subject to dismissal for failure to state a claim when the allegations—on their face—show that an affirmative defense bars recovery on the claim. *See Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1022 (11th Cir. 2001); *see also Jones v. Bock*, 549 U.S. 199, 215 (2007) (reiterating that principle and providing, as an example, that if a complaint's allegations show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim).

*Vicarious Liability and § 1983*

Plaintiff names Sheriff Morgan as a defendant in this action, yet asserts no allegations against Morgan. Significantly, the amended complaint does not assert that Morgan participated *personally* in the charging or arrest of plaintiff, and mentions Morgan but once in the body of the complaint, asserting in that context that Morgan "is named in his official capacity . . . . § 1983 suits against . . . sheriffs in their official capacities [are treated] as suits against counties. Until this matter can be sorted out, the Escambia County Sheriff must still be named for preservation purposes." (Doc. 19, p. 3). Plaintiff was previously advised in the court's Order (doc. 16) that he cannot hold Sheriff Morgan liable for the conduct of the offending officers based solely on Morgan's status as sheriff. (Doc. 16, p. 11). Plaintiff apparently still clings to a claim of supervisory liability, based on plaintiff's arrest by an officer of the Escambia County Sheriff's Department, of which Morgan is simply the executive. "It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat*

*superior* or vicarious liability." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotation marks and citation omitted); *Polk Cnty. v. Dodson*, 454 U.S. 312 (1981); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). "[T]he mere right to control without any control or direction having been exercised and without any failure to supervise is not enough to support § 1983 liability." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 n.58 (1978) (*citing Rizzo v. Goode*, 423 U.S. 362, 370-371 (1976)). "Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990) (citations omitted). In *Douglas v. Yates*, 535 F.3d 1316 (11th Cir. 2008), the Eleventh Circuit set forth the limited circumstances in which a causal connection can be shown sufficient to render a supervisor liable on a § 1983 claim:

> A causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation and he fails to do so; when the supervisor's improper custom or policy leads to deliberate indifference to constitutional rights; or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.

*Id.* at 1322 (*citing West v. Tillman*, 496 F.3d 1321, 1328-29 (11th Cir. 2007)). Plaintiff alleges no such circumstances here. Consequently, the amended complaint fails to state any basis for recovery against Sheriff Morgan.

*Conspiracy*

Plaintiff's conspiracy claim is barred by the intracorporate conspiracy doctrine. "The intracorporate conspiracy doctrine holds that acts of corporate agents are

attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy . . . . [A] corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000). The doctrine applies to an arm of local government. *See Denney v. City of Albany*, 247 F. 3d 1172, 1190-91 (11th Cir. 2001) ("The doctrine applies to public entities such as the City and its personnel."). Here, plaintiff names only Sheriff Morgan, Deputy Webber, and unnamed John Does who are employees and deputies of the Escambia County Sheriff's Office. (Doc. 19, p. 2). The investigation of the incident and plaintiff's subsequent arrest, as far as the four corners of the complaint indicate, were done within the defendants' scope of employment as law enforcement officials. As such, all defendants are employees of the Escambia County Sheriff's office and, therefore, there can be no "meeting of the minds between two or more persons to accomplish a common and unlawful plan." *Id.*

Assuming, *arguendo*, plaintiff named a non Escambia County Sheriff's office defendant, plaintiff would still fail to state a viable claim for conspiracy. Plaintiff argues that Deputy Webber's "checking [with] supervisors" to determine the nature of the charges, "inferences cooperation to violate rights [with] enough specificity to inform defendant of the nature of the conspiracy." (Doc. 19, p. 5). Additionally, plaintiff claims that the Escambia County Sheriff's Office distribution of a press release also indicates the existence of a conspiracy. (Doc. 19, p. 6). The foregoing claims, and the conclusory assertions contained in plaintiff's complaint are not sufficient to demonstrate the existence of a conspiracy under section 1983. *See Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1260 (11th Cir. 2010) ("A plaintiff

may state a § 1983 claim for conspiracy . . . by showing a conspiracy existed that resulted in the actual denial of some underlying right. The plaintiff . . . must show that the parties 'reached an understanding' to deny the plaintiff his or her rights . . . . A plaintiff claiming a § 1983 conspiracy must prove the defendants 'reached an understanding' to violate the plaintiff's constitutional rights.") (citations omitted).

*Malicious Prosecution*

"To establish a federal malicious prosecution claim under § 1983, a plaintiff must prove (1) the elements of the common law tort of malicious prosecution, and (2) a violation of her Fourth Amendment right to be free from unreasonable seizures." *Wood v. Kesler,* 323 F.3d 872, 881 (11th Cir. 2003). Under Florida law, a claim of malicious prosecution has six elements: (1) an original judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damages as a result of the original proceeding. *Durkin v. Davis*, 814 So. 2d 1246, 1248 (Fla. 2d DCA 2002) (*citing Burns v. GCC Beverages, Inc.*, 502 So. 2d 1217 (Fla. 1986)).

The fourth element, the absence of probable cause, deserves specific discussion. In terms of whether probable cause existed:

> Probable cause is defined as facts and circumstances sufficient to warrant a prudent man in believing that [a] suspect . . . committed or was committing an offense. An officer is generally entitled to rely on, among other things, a victim's criminal complaint and identification in a "show-up" as support for probable cause.

*Hendricks v. Sheriff, Collier Cnty., Fla*., No. 12-11736, 2012 WL 4857025, at *3

(11th Cir. Oct. 15, 2012) (citations and quotations omitted); *see also Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995) (finding probable cause to arrest a suspect exists, "if the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." (*quoting Von Stein v. Brescher,* 904 F.2d 572, 578 (11th Cir. 1990))). Probable cause, "requires more than mere suspicion, but does not require convincing proof." *Bailey v. Board of County Com'rs of Alachua Cnty., Fla.*, 956 F.2d 1112, 1120 (11th Cir. 1992). An officer must conduct a "reasonable investigation" into whether probable cause exists, *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998), but is not required to take "'every conceivable step . . . at whatever cost, to eliminate the possibility of convicting an innocent person,'" or investigate every claim of innocence following a suspects arrest. *Tillman v. Coley*, 886 F.2d 317, 321 (11th Cir. 1989) (*quoting Baker v. McCollan*, 443 U.S. 137 (1979)).

Here, plaintiff admits that after the incident, he "assumed a defensive posture as to the only other witness to the incident." (Doc. 19, p. 4). Plaintiff also states that he had problems with the dead dog's owner in the past and these difficulties involved the dead dog's owner keeping a vicious German Shepard "in check while the plaintiff walked the public road for exercise." (Doc. 19, p. 4). Plaintiff was also undergoing a "brief reactive psychosis," when he was interviewed by Deputy Webber. Moreover, plaintiff admits that he did not respond to Deputy Webber's questions because "[a]ny explanation would necessarily include an admission to the accident, thus providing the basis for an immediate warrantless arrest." (Doc. 19, p. 5). Plaintiff, who does not allege custodial interrogation, "asserted" his right to a lawyer, instead of helping

Deputy Webber in the investigation. (Doc. 19, p. 5). Plaintiff continued to refuse to answer Deputy Webber's questions and repeated his request for an attorney. (Doc. 19, p. 5). Deputy Webber, then, allegedly spoke with the "complainant," stating that she was going to "check" with her supervisor to determine what charges could be filed against plaintiff. (Doc. 19, p. 5).

Plaintiff also admits to making statements to a television station that cast him in a "false light." Plaintiff says the aired portion of this interview, featuring the incriminating statements, was submitted "into evidence," which can only mean that plaintiff's own statements were considered by law enforcement. Plaintiff claims that the full unaired portions of the interview put his incriminating statements into the proper context. Plaintiff claims these unaired portions would show he did not intentionally run over the dog; instead, the dog ran after automobiles causing them to come to a complete stop when driving through the neighborhood, and that plaintiff "trained and desensitized the dog so that he could drive the lawful speed limit and that such training took several days to accomplish . . . ." (Doc. 19, pp. 7-8). Plaintiff further states that Deputy Webber failed to preserve these portions of the interview. (Doc. 19, p. 8).

Later, Deputy Webber submitted an arrest affidavit. (Doc. 19, p. 6). The arrest affidavit–submitted to an independent prosecutor who formally decided to charge plaintiff–contained, based on plaintiff's complaint, plaintiff's incriminating statements made to WEAR news. Plaintiff, however, notes that Deputy Webber did not attempt to discover the dog's aggressive propensities including its car chasing or "blocking" behavior, did not attempt to determine if any statement by plaintiff "actually contained purposeful intent to harm the dog," investigate whether witnesses' statements were subject to "further vetting . . . to determine if in fact there

was actual intent," and failed to ask the complainant who called in the incident how "she could allege an intentional crime when she was not a witness to any event or statements surrounding the matter." (Doc. 19, p. 6).

In light of the foregoing facts, Deputy Webber had probable cause to arrest plaintiff. Plaintiff had a prior conflict with the dog's owner and one of the dog owner's dogs, was uncooperative and dismissive during Deputy Webber's investigation of the incident, made incriminating comments to a television station. Plaintiff also states in his complaint that he trained the dog to become "desensitized" to cars. Despite plaintiff's allegations of the existence of possible exculpatory evidence, Deputy Webber, "need not 'investigate every claim of innocence.'" *Tillman*, 886 F.2d at 321 (*quoting Baker*, 443 U.S. 137). Additionally, Florida's animal cruelty statute, § 828.12(2), requires only general intent, meaning, "a defendant need only intend to commit the act that resulted in the harm to the animal or animals." *Horn v. Sec., Fla. Dept. Of Corrections*, 488 F. App'x 421, 422 (11th Cir. 2012); *see also Reynolds v. State*, 784 So. 2d 509 (Fla. 1st DCA 2001). Here, the evidence is sufficient to support the inference that Deputy Webber, and the Escambia County Sheriff's office, had probable cause upon which to arrest plaintiff. Because there was probable cause to arrest plaintiff, plaintiff cannot state a claim for malicious prosecution. The allegations in the complaint, to the extent they are coherent, appear to raise factual defenses to the charge. Such would not, however, negate probable cause.

Assuming, *arguendo*, Deputy Webber lacked probable cause, she would still be entitled to qualified immunity based on arguable probable cause. *See Hendricks*, 2012 WL 4857025, at *3 ("Even if the deputies lacked probable cause, they are still entitled to qualified immunity if they had arguable probable cause to arrest. Arguable

probable cause when an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed. Officers have arguable probable cause even when every element of a crime cannot be proven."); *see also Gold v. City of Miami*, 121 F.3d 1442, 1445 (11th Cir. 1997) ("The standard for arguable probable cause is 'whether a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law.' As we have emphasized before, arguable probable cause is distinct from actual probable cause.") (citations omitted). Deputy Webber would still be entitled to immunity even if she "'reasonably but mistakenly conclude[d] that probable cause [was] present.'" *Williamson*, 65 F.3d at 158 (*quoting Hunter v. Bryant*, 502 U.S. 224, 227 (1991)). Deputy Webber, given such evidence as plaintiff's video recorded incriminating statements, prior history with the dead dog's owner, and overall behavior following the incident, clearly had a reasonable belief that probable cause existed. Deputy Webber, therefore, is entitled to qualified immunity.

*Retaliatory Arrest*

The complaint does not particularly elucidate what type of claim plaintiff is attempting to assert under the title of retaliatory arrest. Plaintiff's complaint, and the facts set out therein, seemingly evidence he is attempting to assert a claim similar to false arrest. Inevitably a claim of false arrest, just as a claim for malicious prosecution, turns on the existence of probable cause. *See Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998) ("[P]robable cause constitutes an absolute bar to both state and § 1983 claims alleging false arrest . . . .").

Plaintiff may also be seeking to fashion a claim under the literal definition of retaliatory arrest or prosecution. A claim for retaliatory arrest, however, is also barred

by the existence of probable cause.  *See Anderson v. City of Naples*, 501 F. App'x 910, 916 (11th Cir. 2012) ("A warrantless arrest without probable cause violates the Fourth Amendment and provides the basis for a § 1983 claim.  Likewise, arrest in retaliation for exercising one's First Amendment Rights may also provide a basis for a § 1983 claim.  However, the existence of probable cause is an absolute bar to both claims.") (citations omitted).  A claim for retaliatory prosecution is similarly barred by the existence of probable cause.  *Wood*, 323 F.3d at 883.  Given the undersigned's previous conclusion that sufficient probable cause existed to arrest the plaintiff, *supra* pp. 9-12, plaintiff's retaliation claim also fails to state a viable basis for recovery.

Plaintiff has had three opportunities to amend his claims.  The previous amend order provided guidance to the *pro se* plaintiff concerning the law governing the types of claims he has purported to advance.  Upon consideration of the facts and theories relied upon by plaintiff, the undersigned is of the opinion that plaintiff cannot plead facts upon which his claims may advance in this court.

Accordingly, it is respectfully RECOMMENDED:

1.    That plaintiff's Third Amended Complaint be DISMISSED WITH PREJUDICE under 28 U.S.C. § 1915(e)(2)(B)(ii) and (iii), for plaintiff's failure to state a claim upon which relief may be granted.

2.   That the clerk be directed to close the file.

At Pensacola, Florida this 31st day of May, 2013.

/s/ *Charles J. Kahn, Jr.*
CHARLES J. KAHN, JR.
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy hereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).